HOUSTON DIRECT NAVIGATION COMPANY V. INSURANCE COMPANY OF NORTH AMERICA.

No. 347.—Decided November 25, 1895.

1. **Interstate Shipment.**

When a commodity has been delivered to a common carrier to be transported on a continuous voyage to a point beyond the limits of the state where delivered, the character of interstate or foreign commerce attaches thereto: e. g. cotton shipped on a barge at Houston, for carriage and delivery to the Mallory line of steamers, to be carried to New York, thence to be shipped to the owner at Liverpool, although the liability of the barge owner is limited to its delivery to the Mallory line at Galveston. (Pp. 4 to 8.)

2. **Same.**

It is not necessary that all the carriers engaged in an interstate or foreign shipment shall be parties to the contract of shipment for the entire route. The character of the shipment is not affected by the fact that the initial shipment was but for a short distance, and the liability of the initial carrier limited until the delivery to the connecting carrier in the route. (P. 8.)

3. **Houston Direct Navigation Company—Charter—Common Carrier.**

By section 10 of the charter of the Houston Direct Navigation Company it is provided that its barges, etc., used in its business "shall be subject in the transportation of freight to the laws applicable to common carriers." This does not have the effect to make the corporation subject to state control when engaged in interstate commerce; its liability is to be determined under the law which may be applicable to the character of commerce in which it may be engaged at the time. (P. 9.)

4. **Same—May Limit Liability.**

The Houston Direct Navigation Company, carrying cotton to Galveston in part of its route to Liverpool via New York, is liable as a carrier under the laws of Congress, or the common law so far as Congress has made no provision therefor, and not under the statutes of the state of Texas, which forbid the carrier to limit its liability as at common law. It was error to disregard a freight contract which had such limitations. (P. 9.)

ERROR to Court of Civil Appeals for First District, in an appeal from Galveston County.

The Insurance Company of North America, having paid to the owner a loss under one of its policies upon certain cotton shipped upon a barge of the Houston Direct Navigation Company and burned thereon while being unloaded at Galveston, sued the carrier therefor, the latter defending under a clause in the bill of lading exempting it from liability for loss by fire. Plaintiff had judgment in the trial court, which was affirmed by the Court of Civil Appeals.

*Mott & Armstrong*, for plaintiff in error.—The court erred in holding in effect that the cotton burned and damaged was an element of State or local commerce, and subject to the limitations, conditions and restrictions imposed by the State of Texas, and in not holding that the cotton was an element of interstate and foreign commerce, and in no wise subject to any limitations, conditions or restrictions imposed by the State of Texas. (a.) Whenever a commodity has begun to move as an article of trade from one State to another or to a foreign country, its final destination having been fixed before delivery to the initial carrier, commerce in that commodity between the States or with foreign nations has commenced. (b.) It is wholly immaterial what may be the scope or extent of the service to be performed with respect to the transportation of the commodity by the initial carrier, provided only the commodity itself is destined for and on its route to another State or to a foreign country. The Daniel Ball, 10 Wall., 557; Coe v. Errol, 116 U. S., 517; ex parte Koehler, 30 Fed. Rep., 869; in re Greene, 52 Fed. Rep., 113; Cutting v. Florida Ry. & Nav. Co., 46 Fed. Rep., 641; Railway v. Pennsylvania, 136 U. S., 118; Pac. Coast S. S. Co. v. Board of R. R. Commissioners, 9 Sawyer, 253; Pensacola Tel. Co. v. Western Union, 6 Otto, 1; Gibbons v. Ogden, 1 Wheat., 1; Welton v. Missouri, 1 Otto, 275.

The court erred in holding that the act of Congress which relieves owners of vessels and barges from liability for loss by fire without the fault or design of such owners has no application to the transportation of the cotton from Houston to Galveston, for this, that the cotton from the very moment of delivery to the defendant company was destined for and on its final voyage to the ports of New York and Liverpool and constituted an element of interstate and foreign commerce and was subject to regulation by the acts of Congress in the transportation thereof. (a.) The power to regulate commerce with foreign nations and among the several States, vested in Congress by article 1, section 8, of the Constitution of the United States, is exclusive. (b.) The power of Congress to regulate commerce with foreign nations and among the several States is exclusive wherever the matter is national in its character or permits of one uniform plan or system of regulation; and the non-exercise of this power to regulate commerce is equivalent to saying that it shall not be regulated. (c.) State legislation affecting matters of purely local interest and importance is superseded by and must yield to legislation by Congress within the scope of its jurisdiction. The bills of lading provide that the Houston Direct Navigation Company and its connections shall not be liable for loss or damage by fire. The act of Congress, March 3, 1851, section 4282 of the Revised Statutes of the United States, is in terms as follows: "Sec. 4282. No owner of any vessel shall be liable to answer for or make good to any person any loss or damage which may happen to any merchandise whatever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

Section 4289 of said act, as amended June 19, 1886, is in terms as follows: "Sec. 4289. The provisions of the seven preceding sections and of sec. 18 of an act entitled 'An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade and for other purposes,' approved June 26, 1884, relating to the limitations of the liability of the owners of vessels, shall apply to all sea-going vessels, and also to all vessels used on lakes and rivers or in inland navigation, including canal-boats, barges and lighters." Article 18 of the act June 26, 1884, referred to in the amended section 4289, provides—"That the individual liability of the ship-owner, shall be limited to the proportion of any and all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liability of all the owners of a vessel on account of the same shall not exceed the value of such vessel and freight pending: Provided, that this provision shall not affect the liability of any owner incurred previous to the passage of this act, nor prevent any claimant from joining all the owners in one action; nor shall the same apply to wages due to persons employed by said ship-owners." The defendant company pleaded that the loss was occasioned by fire not due to its own negligence, nor to its design or neglect. Morris and Cummings v. State, 62 Texas, 738-739; Railway v. China Mnfg. Co., 79 Texas, 26; Dillingham, Receiver, v. Fischl, 1 Texas Civ. App., 552; Railway v. Sherwood, 84 Texas, 133; 1 White & Wilson Civ. C., secs. 335, 1260; Gloucester Ferry Co. v. Pa., 114 U. S., 196; Welton v. Missouri, 1 Otto, 275; Brown v. Houston, 114 U. S., 622; Brown v. Maryland, 12 Wheaton, 445; County of Mobile v. Kimball, 12 Otto, 691; Philadelphia S. S. Co. v. Pa., 122 U. S., 326; Escanaba Trans. Co. v. Chicago, 107 U. S., 678; Gilman v. Philadelphia, 3 Wall, 713; Sinnot v. Davenport, 22 How., 227; Hall v. De Cuir, 5 Otto, 485; Cooley's Constitutional Limitations, 6th Ed., 595; Cooley's Principles of Constitutional Law, 69.

The language of the Special Act creating the Houston Direct Navigation Company, affecting and relating to the transportation of goods, wares and merchandise upon the navigable waters of the United States subject to the jurisdiction thereof, and to the execution of maritime contracts, is not to be construed as trenching upon or inconsistent with the powers and the jurisdiction vested in the federal branch of the government. Genesee Chief, 12 How., 443; Fretz v. Bull, 12 How., 466; Daniel Ball, 10 Wall., 557; Montello, 11 Wall., 414; ex parte Boyer, 109 U. S., 629; Hine v. Trevor, 141 U. S., 1; Brown v. Houston, 114 U. S., 622; Sutherland's Statutory Construction, secs. 332, 333, 239, 240, 241, 288; in re Caesar Griffin, 25 Texas Sup., 635; Cooley's Constitutional Limitations, 6th Ed., 218; Galveston, etc., Co. v. Gross, 47 Texas, 434-436; Taylor v. Duncan, Dallam, 518; Neill v. Keese, 5 Texas, 32; Sutherland v. DeLeon, 1 Texas, 303; Berry v. Childress, 32 Texas, 372; Selman v. Wolfe, 27 Texas, 72; Titles 48-50, Revised Stats. U. S., with amendments thereto.

· *Hume & Kleberg,* for defendant in error.—The bill of lading under which the cotton was shipped was strictly a domestic bill of lading, and the stipulations therein exempting the carrier from its common law liability were contrary to the statutes of this State and wholly void. Rev. Stats., arts. 277 and 278; Railway v. Sherwood, 84 Texas, 132; Railway v. Cross, 5 Texas Civ. App., 454; Railway v. Illinois, 118 U. S., 564.

The appellant is without power to issue a bill of lading exempting it from its common law liability as a common carrier. Appellant was chartered by a special act of the legislature of Texas, approved October 1866, (See Special Acts of 1866, 114.) By section 10 of the act it is provided that in the transportation of freight appellant shall be subject to the laws applicable to common carriers. The act of the legislature forbidding any limitations upon the common law liability of common carriers as it now stands was passed December 4, 1863. The act of Congress exempting owners of vessels from liability for loss or damage which may happen to any goods shipped on board such vessels by fire, unless caused by the neglect or design of such owners, does not apply to the case at bar and can afford no relief for appellant; because the act of its creation makes it, in the transportation of freight, subject to the laws of common carriers as defined by the statutes of the State of Texas.

BROWN, ASSOCIATE JUSTICE.—The Insurance Company of North America sued the Direct Navigation Company to recover damage done to and the value of cotton destroyed by fire while in the possession of the Navigation Company,—the insurance company having paid the loss to the owners of the cotton, which had been shipped from Houston on a barge belonging to the navigation company, and insured for the owners by the Insurance Company of North America. The insurance company claimed to be subrogated to the rights of the owners. The navigation company pleaded a general denial, and by special answer to the effect that the fire "was not due to its negligence, nor to its design or neglect;" that the shipment was an interstate shipment, and that the contracts for the transportation of the cotton were maritime contracts concerning the transportation of freight upon the navigable waters of the United Sates connecting with the high seas; that the barge Katinka was duly enrolled and licensed under the laws of the United States for engaging in such commerce; that the loss was occasioned by fire not due to its negligence. There was a trial before the court without a jury, and judgment rendered for the plaintiff, which judgment was affirmed by the Court of Civil Appeals. The facts are as follows:

The Direct Navigation Company is a corporation created by special act of the legislature of the State of Texas, approved October 9, 1866, which act contains, among others, the following provision:

"Section 10. That the company shall, within six months after the passage of this charter through the legislature, have on the waters of

Buffalo Bayou and Galveston Bay and Harbor a sufficient number of steamers, barges and propellers to meet the demands of commerce upon said company, and they shall be subject in the transportation of freight to·the laws applicable to common carriers."

The navigation company was organized under this act, and ever since has operated under it and under license from the United States, running and navigating steamers, barges and propellers upon the waters of Buffalo Bayou and Galveston Bay, between the city of Houston and the city of Galveston, and to sea-going vessels, for the purpose of transporting freight. During the month of September, 1892, it owned and operated upon said waters the barge Katinka. On the 15th of September, 1892, the company received, at Houston, Texas, 184 bales of cotton, and on the 16th of the same month it received, at Houston, 154 bales of cotton, giving bills of lading therefor. The bills of lading recited that the cotton was received by the Houston Direct Navigation Company, in apparent good order and well conditioned, of Zeigler & McIlhenny for delivery to order, notify John Sherwood & Co. and O. Hayworth, respectively, or their assigns, at Galveston, he or they paying freight and charges, as per margin. The freight and charges were paid at Houston. The bills of lading further provided, as follows: "It is understood and expressly stipulated that the liability of the Houston Direct Navigation Company shall cease upon delivery to the next connecting line, and that the said Houston Direct Navigation Company and its connections, which receive and transport the said property, shall not be liable for loss by fire * * * The cotton under this bill of lading * * * is to be transported to the depots, or the landings of the steamboats of forwarding lines. at the points· receipted to, for delivery. It is further agreed that, in case of any loss or damage, that company alone shall be answerable therefor in whose actual custody the same may be at the time of the happening of such loss. This contract is executed and accomplished, and the liability of the Houston Direct Navigation Company terminates on the delivery of the cotton to the Mallory Line at Galveston, when the liability of the said Mallory Line commences, and not before."

The cotton shipped to order, notify John Sherwood & Co., was the property of John Sherwood & Co., who resided in Liverpool; and the cotton shipped to order, notify O. Hayworth, was the property of C. Menelas, who was a foreign buyer. When the cotton was delivered to the Direct Navigation Company it was started on its trip to New York and Liverpool, to be transported by the defendant, the navigation company, to Galveston, there delivered to the Mallory Line, which was to transport it to New York, to be there delivered to a connecting line, and thence transported to Liverpool. The bill of lading given by the navigation company was only to Galveston, and then the remainder of the cotton, not destroyed, was delivered to the Mallory Line, which gave another bill of lading.

On the 19th day of September, 1892, after 172 bales of the cotton had

been unloaded from the barge Katinka, at one of the wharves at Galveston, a fire broke out in the balance of the cargo yet on board the barge, destroying a part thereof and damaging the balance. The insurance company, under the terms of its policy, took the damaged cotton and paid the full amount of the insurance on the cotton so burned, amounting in the aggregate to the sum of $6,729.33. It sold the damaged cotton in open market to the highest bidder, sustaining a loss of $1,643.78, being the value of the cotton burned and the difference between the value of the damaged cotton before it was damaged and the amount realized from the sale.

The trial court found that the origin of the fire was unknown, but it expressly declined to determine whether the fire originated from the negligence of the navigation company or not.

Under a number of assignments practically two questions are presented in this case, which may be stated as follows:

1. Was the Direct Navigation Company engaged in interstate commerce while transporting the cotton in question from Houston to Galveston? If so; then,

2. Did the provision in its charter that it should "be subject in the transportation of freight to the laws applicable to common carriers," operate to make it liable under the laws of the State for the loss sustained, notwithstanding the limitation contained in the bill of lading and the exemption provided by the statutes of the United States?

No distinct and certain definition of interstate commerce has yet been fixed by the decisions of the courts, and perhaps none can be given which will apply to all cases. But the law as applicable to this case, deducible from the decisions of the courts, may be stated thus: When a commodity has been delivered to a common carrier, to be transported on a continuous voyage or trip to a point beyond the limits of the State where delivered, the character of interstate or foreign commerce attaches thereto. (Coe v. Erroll, 116 U. S., 517; The Daniel Ball, 10 Wall., 557; ex parte Koehler, 30 Fed. Rep., 867; in re Greene, 52 Fed. Rep., 113; Railway v. Sherwood, 84 Texas, 125.)

In Coe v. Erroll, supra, the question to be determined was whether or not the property in question was subject to taxation in the State where it then was, and this question depended upon whether or not it had become an element of interstate commerce. The court said: "But no distinct rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State, will indicate the view which seems to us the sound one on that subject, namely: that such goods do not cease to be a part of the general mass of property in the State, subject, as such, to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another State or have been started upon such transportation in a continuous route or

journey.   We think that this must be the true rule on the subject.
*   *   *.   And so we think they continue to be until they have entered
upon their final journey for leaving the State and going into another
State.   It is true it was said in the case of The Daniel Ball, 10 Wall.,
565:  'Whenever a commodity has begun to move as an article of trade
from one State to another, commerce in that commodity between the
States has commenced.'   But this movement does not begin until the
articles have been shipped or started for transportation from the one
State to the other.   The carrying of them in carts or other vehicles,
or even floating them to the depot where the journey is to commence
is no part of that journey.   That is all preliminary work, performed for
the purpose of putting the property in a state of preparation and readi-
ness for transportation.   Until actually launched on its way to another
State, or committed to a common carrier for transportation to such
State, its destination is not fixed and certain.   It may be sold or other-
wise disposed of within the State, and never put in course of transpor-
tation out of the State.   Carrying it from the farm or the forest to the
depot is only an interior movement of the property, entirely within the
State, for the purpose, it is true, but only for the purpose, of putting
it into a course of exportation; it is no part of the exportation itself.
Until shipped or started on its final journey out of the State its expor-
tation is a matter altogether in fieri, and not at all a fixed and certain
thing."

The questions to be determined are:  Did the cotton in question when
delivered to the navigation company start on its journey to a point out-
side of the State of Texas?  Was its destination at that time fixed and
determined upon, and was the carriage from Houston to Galveston a
part of the voyage which was to be continuous?  The facts of this case
show that the owners of the cotton lived in Liverpool, and the cotton
itself was, by their agents, put in transportation by delivery to the navi-
gation company, to be carried by it to the city of Galveston, and there
delivered to the Mallory Line, by which it was to be transported to New
York, and thence by connecting line of steamers to the city of Liverpool.
The bill of lading upon its face showed that the navigation company
was to deliver the cotton to the Mallory Line at Galveston, at which time
the liability of the navigation company should cease and that of the
Mallory Line should attach.   There can be no doubt that the destination
of the cotton at the time of its delivery to the navigation company was
fixed and determined, and the point at which it was destined for final
delivery was beyond the limits of this State.   It is equally clear from
the bill of lading and other testimony that a continuous voyage was con-
templated, and the trip between Houston and Galveston was simply a
part of that voyage.   Upon this state of facts the cotton would undoubt-
edly come within the rule laid down in the case cited above, and would
be classed as interstate commerce.

But the evidence likewise shows that the Houston Direct Navigation
Company gave a bill of lading to Galveston only and not a through bill

to cover the entire route, and the charges for freight to Galveston and wharfage at that place were paid at the time that the cotton was delivered. Do these facts change the rule of law applicable to the case and constitute this a local shipment, as distinguished from interstate or foreign commerce?

It has been generally held that where a carrier in one State receives a commodity for shipment by a continuous trip over its own line and connecting lines, giving a through bill of lading to the point of destination, with the provision that its own liability shall cease upon delivery to its connecting line, at a point within the State where it was received, such transportation is to be considered as interstate commerce, and the carrier is but one of several agencies employed. Railway v. Sherwood, 84 Texas, 135. The fact that the bill of lading given by the Direct Navigation Company was only to Galveston establishes simply that the liability of the company terminated at that point, and has the same effect, and no more, as if a through bill had been given by the receiving carrier, with the stipulation that its liability should terminate when delivered to the connecting carrier. The effect of such bill of lading as last named would be to make it, although a through bill upon its face, in effect a separate bill, so far as the liability is concerned of each carrier engaged in the transportation.

We do not understand that it is necessary that all of the carriers engaged in an interstate or foreign shipment shall be parties to the contract of shipment for the entire route. In fact, as we understand the decisions, the character of the commerce is not affected by the terms of the contract of the carrier as it relates to liability for the freight, but only in so far as it shows that it is or is not a part of the continuous carriage from the beginning point to the point of destination. (The Daniel Ball, cited above; Harmon v. Chicago, 35 Am. & Eng. Corp. Cases, 654; Foster v. Davenport, 22 How., 244.) The last two cases cited involved the question as to whether or not tugboats, engaged in towing vessels which were themselves engaged in interstate commerce, were to be considered as likewise engaged in such commerce. In each case it was held that such tugboats, although operating locally and within the limits of a State, were to be considered as engaged in interstate commerce, and not subject to the laws of the State. The tugboats were in no sense parties to the contracts for transportation, but were simply agencies employed therein.

In Heiserman v. Railway, 63 Iowa, 732, the Supreme Court of that State, upon a bill of lading similar to the one given in this case, held that the transaction constituted a local shipment, and that the rights of the parties were to be determined by the laws of that State. In Railway v. Sherwood, 84 Texas, on page 135, the judge who delivered that opinion approved the case of Heiserman v. the Railway Company, but the question decided in the case approved and now before this court was not embraced in the case then being decided, and the expressions of approval of the Iowa case are simply obiter dicta and not to be taken

as authority.  The Court of Civil Appeals and the counsel for defendant in error refer to the case of Rio Grande Railway Company v. Cross, 5 Texas Civ. App., 454, in which this court refused an application for a writ of error.  In that case the Court of Civil Appeals said: "The evidence does not show that the shipment of the money was interstate, but if it did the limitation of liability by the steamship company in its bill of lading applies only to carriage by the ship."  The two propositions were involved in the decision of that case, and this court refused the application for writ of error upon the ground that the limitation of liability by the steamship company in the bill of lading given by it did not apply to the carriage by the railway company.  The refusal of a writ of error does not imply the approval of the decision of the Court of Civil Appeals upon all questions discussed by it, but simply of the result of the judgment of that court.

We conclude from the authorities and the facts in this case that the transportation of the cotton by the Direct Navigation Company from Houston to Galveston was interstate or foreign commerce, and that its liability for the loss must be determined by the rules of law established by Congress, in so far as such rules have been prescribed, unless the provision of the charter, before quoted, operates to subject the corporation in the carriage of interstate commerce to the statutes of the State instead of the laws of Congress.

We believe that the proper construction of the language used in the charter of the navigation company is simply to express as matter of law that it is to be regarded as a common carrier, and as such subject to whatever law may be applicable to a common carrier in the business in which it may be engaged.  The effect of this statutory declaration is to relieve persons who may have claims against it of the necessity of establishing its character as a common carrier, and to make it liable as such for all losses sustained or injuries inflicted in the transaction of its business.  It is not necessary, in the view we take of this case, to determine the question of the validity of such a provision in the charter if found to be in conflict with the laws of the United States.  We simply hold that the language quoted does not have the effect to make the corporation created by the charter subject to State control when engaged in interstate commerce, but that, being a common carrier, and so declared by its charter to be, its liability as such is to be determined under the law which may be applicable to the character of commerce in which it may be engaged at the time.

It follows from what we have said that, in our opinion, the liability of the navigation company in this case is to be determined under the laws of Congress upon the subject, or the common law, in so far as Congress has made no provision therefor, and not by the statutes of the State of Texas, which forbid the carrier to limit its liability as at common law.

The trial court expressly declined to pass upon the question of negligence on the part of the navigation company, and the Court of Civil

Appeals made no finding thereon.   There was evidence on the part of the carrier tending to show diligence and to negative the idea of negligence on its part, but the evidence is not so conclusive as to justify this court in holding as matter of law that the loss did not occur through the negligence of the navigation company.

We therefore cannot enter judgment in this case, but for the errors of the District Court and the Court of Civil Appeals, as shown herein, the judgments of both courts are reversed and this cause is remanded to the District Court.

*Reversed and remanded.*